UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CRIMINAL ACTION NO. 4:25-CR-00016-GNS-HBB

UNITED STATES OF AMERICA                                                              PLAINTIFF

VS.

CORY JAMES LUSSIER                                                                    DEFENDANT

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATION

Before the Court is Defendant Cory James Lussier's motion to suppress evidence (DN 18). The United States has filed a Response at DN 21 and Lussier has not filed a Reply. The motion is referred to the undersigned for findings of facts, conclusions of law, and recommended disposition (DN 23). The undersigned previously held a telephonic conference in the case to discuss whether an evidentiary hearing was necessary. The parties and the undersigned concurred that the law enforcement officers' "body cam" videos (DN 18-2, DN 18-3, DN 18-4) provide an accurate record of the events in question, and no evidentiary hearing is required (*See* DN 25).

### Nature of the Case

Lussier was stopped by a City of Providence police officer on suspicion that he was driving while his license was suspended. During their interaction the officer asked Lussier if there were any weapons in the car and Lussier responded there was a handgun. Shortly thereafter Lussier stated to another law enforcement officer at the scene that he was a felon. Lussier gave the officer permission to open his car door and retrieve the handgun. On June 11, 2025, a grand jury issued an indictment charging Lussier with the offense of being a felon in possession of a firearm in

violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (DN 1).  Lussier seeks suppression of the discovery of the firearm as well as statements he made about his possession of the firearm and his status as a felon (DN 18, p. 1).

Findings of Fact

On the evening of February 2, 2025, Providence Police Officer Cameron Shelton received a report from Sebree Chief of Police Nathan Stinchcomb that Lussier had been seen at a Huck's convenience store and was driving while on a suspended license.  Chief Stinchcomb informed Officer Shelton of Lussier's direction of travel and that he was driving a Maserati.  Officer Shelton observed Lussier's vehicle and began following it.  Lussier briefly accelerated and turned onto another street, but stopped when Officer Shelton activated his lights.[1]

Officer Shelton approached the passenger side of Lussier's vehicle and knocked on the roof.[2]  Lussier lowered the passenger window and Officer Shelton asked "how's it going?"  Lussier answered "doing all right" and then immediately began explaining that he was "down here trying to do some stuff for the [drug] task force."[3]  Officer Shelton asked who he had been working with.  Lussier tried, but could not recall the name.[4]  Officer Shelton then asked "do you have any weapons or anything in the car?"[5]  The elapsed time between when Officer Shelton asked Lussier "how's it going" to asking about weapons was approximately forty seconds.  Lussier answered "no," but immediately added "oh yes, yes I do."[6]  Officer Shelton asked "where, without grabbing it?"[7]  Lussier responded "it's over here," and indicated his left side.[8]  Without further prompting, Lussier

---

[1] DN 18-1, DN 21-1, DN 27.
[2] DN 18-3 at 0:31.
[3] *Id.* at 0:35-52.
[4] *Id.* at 0:53.
[5] *Id.* at 1:16.
[6] *Id.* at 1:18.
[7] *Id.* at 1:20.
[8] *Id.* at 1:22.

2

embarked on a detailed explanation of his plans to arrange narcotics purchases, with Officer Shelton asking clarifying questions about who he planned to meet and where.[9] Officer Shelton asked Lussier if he had his license, and he stated he did not.[10] Officer Shelton then asked "without reaching for it, what weapon do you have?"[11] Lussier responded "it's a nine millimeter pistol."[12] Officer Shelton asked "is it loaded?"[13] Lussier answered "yes" and immediately explained "because I'm going to meet with a dude and he's one that I don't really trust out there like that" and "it's one of areas that the [expletive] may try to do something with you."[14] He went on to explain that he was working with a task force officer and needed to be in a position to protect himself when trying to set up a deal to purchase "a half pound or a pound of dope." He continued to talk about his efforts to purchase narcotics on behalf of the task force, and recalled the name of the Officer with whom he claimed to be working, providing details about the officer's affiliation.[15] Officer Shelton asked if Lussier was working with law enforcement as cooperation in regard to pending charges or if he was being paid.[16] Lussier indicated that he had been pulled over for not having a license, but then veered off topic to explain that he had to continue driving without a license in order to work potential narcotics deals, as having someone drive him would impair his credibility. He also explained how he did not want his wife to know he was working with the police.[17]

---

[9] *Id.* at 1:24-2:45.
[10] *Id.* at 2:46-2:49.
[11] *Id.* at 2:50.
[12] *Id.* at 2:53.
[13] *Id.* at 2:55.
[14] *Id.* at 2:57-3:12.
[15] *Id.* at 3:12-4:55.
[16] *Id.* at 4:57.
[17] *Id.* at 5:02-6:21.

3

Approximately six minutes into this exchange, Webster County Deputy Sheriff Aaron Elder arrived on scene, and Officer Shelton told him "there's a loaded handgun in the driver door."[18] Deputy Elder approached the driver-side door where Lussier had lowered the window and Lussier immediately stated "yeah, yeah its right there."[19] Officer Shelton walked around the back of Lussier's car and joined Deputy Elder. Officer Shelton asked Lussier his name and then returned to his patrol vehicle to run a check.[20]

After Officer Shelton walked away, Lussier went on to volunteer to Deputy Elder that he had the handgun "because where I'm going out in Blackford because I've been working with [task force officer] Madden trying to get the [expletive] to try and line up for like a half pound of [expletive] dope and [expletive] you know, you can't really go out that [expletive] home and buy [expletive] like that and people don't really know you."[21] Deputy Elder casually talked with Lussier about the area where he lived and noted that he had seen his car before.[22]

Approximately one minute into their interaction Deputy Elder stated "since you have a handgun in here right beside you, I'm going to just ask you to lift it out."[23] Lussier responded he had it because he was trying to line up a narcotics purchase.[24] Deputy Elder stated "you have the right to protect yourself but just since you have the gun in there . . ." to which Lussier responded "you can reach down there and take it out."[25] Deputy Elder answered "no, you're good just as long as you're sitting there like that."[26] Lussier again explained that he was working with the task

---

[18] *Id.* at 6:22.
[19] DN 18-2 at 0:15.
[20] DN 18-3 at 6:43.
[21] DN 18-2 at 0:18-0:33.
[22] *Id.* at 0:45-1:00.
[23] *Id.* at 1:02.
[24] *Id.* at 1:07-1:11.
[25] *Id.* at 1:12-1:20.
[26] *Id.* at 1:20-1:22.

4

force and was "trying to work something to get something into play."[27] Deputy Elder responded "fair enough"[28] and Lussier continued "on that note, I can't walk out there in the middle of nowhere in Blackford with people I ain't never met . . . ."[29] Deputy Elder interjected "as long as you're not a felon, you're allowed to have firearms . . ."[30] to which Lussier immediately interrupted "no, no, I mean I am a felon. I'm a felon."[31] He went on to explain "it's complicated what we're trying to do. Because, like yes, I can't, I'm not supposed to have one, but, like you can't, you know you can't go out to someone like that . . ."[32] Deputy Elder asked "do you mind if I open up your door?"[33] to which Lussier responded [indicating agreement] "absolutely not, no, it's right there."[34] Deputy Elder opened the door and retrieved the firearm from what appears to be the door side pocket.[35] Less than three minutes had elapsed in Deputy Elder's interaction with Lussier, and total the duration of the stop at this point was approximately seven and one half minutes. As Detective Elder retrieved the firearm, he observed a small bit of plastic tied up as a baggie on the floorboard. He asked Lussier what it was and Lussier responded that it was "weed."[36]

Meanwhile, back at his patrol vehicle, Officer Shelton's investigation revealed that Lussier was not working as a confidential informant and also confirmed Lussier's felon status.[37] Approximately six minutes after taking custody of the handgun, Deputy Elder asked Lussier to exit his vehicle, advised him he was detained and read him his *Miranda* rights.[38] A subsequent

---

[27] *Id.* at 1:25-1:44.
[28] *Id.* at 1:45.
[29] *Id.* at 1:46-1:54.
[30] *Id.* at 1:55.
[31] *Id.* at 1:56.
[32] *Id.* at 2:03-2:17.
[33] *Id.* at 2:19.
[34] *Id.* at 2:20.
[35] *Id.* at 2:24.
[36] *Id.* at 2:53.
[37] *Id.* at 3:07.
[38] *Id.* 8:19.

5

search of the car disclosed other narcotics-related evidence, however Lussier is not charged with any narcotics offenses in this matter.

## Lussier's Motion

Lussier's first argument for suppression of his statements about his possession of the handgun, his acknowledgement of his status as a felon, and the subsequent discovery of the handgun, is that the initial traffic stop was conducted without a valid objective basis, and thus constituted an unlawful seizure (DN 18, p. 3). He contends that the tip from Chief Stinchcomb that he was driving on a suspended license was insufficient to constitute probable cause to believe that Lussier was violating a traffic regulation (*Id.*).

His next argument is that, even if the traffic stop was lawful, the officers unconstitutionally prolonged the stop beyond the time reasonably required to complete the mission of addressing the alleged traffic violation (*Id.* at pp. 3-5). Noting that the reason proffered by the prosecution for the stop was a report that he was operating a vehicle without a license, Lussier contends that the officers extended the reasonably necessary scope and duration needed to complete the tasks associated with the stop (*Id.* at p. 4). He lists the following police activities as unrelated to the scope of the stop:

1. Questioning him about weapons in the car;
2. Contacting drug a task force officer to inquire about his status as an informant;
3. Questioning him about identities and locations of alleged drug dealers;
4. Questioning him about whether he sold drugs and from whom he purchased them;
5. Administration of a field sobriety tests which were unrelated to the alleged traffic violation.

(*Id.*). These, he contends, transformed what should have been a brief traffic stop into an extended criminal investigation, noting that the totality of Officer Shelton's body camera recording is nearly

an hour long (*Id.* at p. 5).  Lussier agrees that officers can extend a traffic stop beyond its original mission if they have reasonable suspicion that criminal activity is afoot (*Id.*).  Here, he argues, the officers had no independent reasonable suspicion of any criminal activity beyond the alleged traffic violation (*Id.*).  He notes that his statement that he was working to help law enforcement is not evidence of crime, and the firearm was not discovered until the traffic stop had already been unlawfully extended (*Id.*).

Next, Lussier argues that his statements and the physical evidence should be suppressed because the stop exceeded the bounds of a routine traffic stop and he was therefore subjected to a custodial interrogation without the benefit of being advised of his *Miranda* rights (*Id.* at pp. 5-7).

Turning to the search of his vehicle, Lussier contends that there is no applicable exception which permitted the officers to conduct a warrantless search (*Id.* at pp. 7-8).  His consent to the search of the car, he argues, was nullified by the fact that it followed an unconstitutional interrogation (*Id.* at p. 7).  As to the plain view exception, he contends the deputy's position at the door from which the firearm might be viewed was the product of unconstitutional questioning, negating that doctrine (*Id.* at p. 8).  Finally, he argues the automobile exception does not apply because any search could only have been conducted on the basis of unconstitutionally-obtained statements he made (*Id.*).

## The United States's Response

The United States disputes that the officer lacked probable cause to execute the traffic stop (DN 21, pp. 3-4).  The officer, it asserts, was notified that Lussier was driving while his license was suspended (*Id.* at p. 4).  Operating on a suspended license is a violation of Kentucky law and, as the officer observed Lussier operating the vehicle, had probable cause to execute the stop (*Id.*).

7

The United States agrees that a traffic stop must be limited to addressing the subject of the suspected infraction; however, it notes the stop may be prolonged if officers have reasonable suspicion of additional wrongdoing (*Id.* at p. 4). Here, the United States notes that Lussier stated he had a firearm in the car, which triggered the officers' need to ensure their personal safety (*Id.* at p. 5). Once Lussier confirmed that he was a felon and officers obtained the firearm, additional extension of the stop was warranted (*Id.*).

Lussier's statements, the United States argues, were voluntary and not barred by the Fifth Amendment, noting that Lussier "volunteered" that he had a weapon and was a felon (*Id.* at pp. 5-6). As he made these statements outside the context of a custodial interrogation, the United States contends that no *Miranda* warning was necessary (*Id.* at pp. 6-7). As to the warrantless search, the United States argues that the automobile exception does apply, as Lussier's statement about the presence of the firearm and his status as a felon entitled the officers to secure the weapon (*Id.* at pp. 7-8). Moreover, the United States notes that Lussier gave consent for the officer to open the car door and retrieve the handgun (*Id.*). Finally, the United States offers the inevitable discovery doctrine as a basis for admission of the evidence, as the officers had authority to search the car for a firearm to ensure officer safety based upon Lussier's statement that he was a felon and had a firearm in the vehicle (*Id.* at p. 8).

## Conclusions of Law

The threshold issue is whether Officer Shelton had probable cause to execute the traffic stop. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. CONST. AMEND. IV. A traffic stop constitutes a "seizure" under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). The reasonableness of a traffic stop depends on

whether the police have reasonable suspicion to believe that a traffic violation has occurred. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). Here, there is no question that Lussier's license was suspended on the evening in question, that operating a motor vehicle on a suspended license is a violation of Kentucky law,[39] and that Officer Shelton observed the motor vehicle Lussier was reported to be driving. The only question is whether Officer Shelton needed personal knowledge of Lussier's license status or that he was the driver of the Maserati in order to have probable cause to effect the stop. He did not, as he was entitled to rely upon information provided by Chief Stinchcomb.[40]

> It is well-established that an officer may conduct a stop based on information obtained by fellow officers. *United States v. Barnes*, 910 F.2d 1342, 1344 (6th Cir. 1990) (citing *United States v. Hensley*, 469 U.S. 221, 229, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985)). Variously called the "collective knowledge" or "fellow officer" rule, this doctrine recognizes the practical reality that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another." *Hensley*, 469 U.S. at 231 (quotation omitted).

*United States v. Lyons*, 687 F.3d 754, 765-766 (6th Cir. 2012). The next inquiry is whether stop was reasonable in scope and duration.

> The initial length of the stop may stretch as long as the officer reasonably needs to complete the mission for which it began. Ordinarily, as here, the mission includes issuing a ticket for the violation that occasioned the stop and attending to related safety concerns. But once that initial mission has (or reasonably should have) concluded, if the officer wants to continue the stop for other reasons, she must demonstrate an additional modicum of reasonable suspicion.

*United States v. Williams*, 68 F.4th 304, 307 (6th Cir. 2023) (citation modified).

---

[39] *See* K.R.S. § 189A.090.
[40] Defendant does not appear to challenge whether the traffic infraction was the true motivating reason for the stop. Regardless, "[a] traffic violation provides probable cause to justify a stop 'even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop.' Accordingly, '[w]hen a traffic stop is supported by probable cause, an officer's subjective intent' behind stopping the vehicle 'is irrelevant.'" *Bazzi v. City of Dearborn*, 658 F.3d 598, 604 (6th Cir. 2011) (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) and *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)); *see also United States v. Whren*, 517 U.S. 806, 813 (1996) (constitutional reasonableness of traffic stop is not dependent on the actual motivation of the individual officers involved); *United States v. Parker*, 17 F. Supp. 3d 667, 670 (W.D. Ky. 2014) (traffic stop's legality turns on validity of officer's objective explanation for making the stop, not the officer's subjective intention).

In evaluating the reasonableness of the stop, the Court is directed to conduct a fact-bound, context-dependent inquiry in each case. *United States v. Everett*, 601 F.3d 484, 493 (6th Cir. 2010). To this end "the proper inquiry is whether the 'totality of the circumstances surrounding the stop' indicates that the duration of the stop as a whole—including any prolongation due to suspicionless unrelated questioning—was reasonable." *Id.* at 494 (quoting *United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008)). Here, the totality of the circumstances clearly demonstrate that the traffic stop was not unreasonably extended. Officer Shelton's first interaction with Lussier was a common pleasantry of asking him "how's it going?"[41] Lussier answered that he was doing all right, and then immediately launched into an unsolicited explanation of his reason for being in the area as working for the drug task force.[42] This momentarily diverted Officer Shelton to ask the logical question of who he was working with, and Lussier was unable to recall the name of his supposed law enforcement contact.[43] The next question Officer Shelton asked was whether there were any weapons in the car.[44] He was not required to provide Lussier a *Miranda* warning before asking the question, as Lussier was not at that time in custody. The requirement to give *Miranda* warnings is not triggered absent a custodial interrogation. *United States v. Woods*, 711 F.3d 737, 740 (6th Cir. 2013).

The Supreme Court has held that "the temporary and relatively nonthreatening detention involved in a traffic stop . . . does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010). Merely asking about the presence of weapons does not convert the traffic stop into a custodial situation. *See United States v. McCrary*, No. 3:22-CR-105-CRS, 2023 U.S. Dist.

---

[41] DN 18-3 at 0:35-52.
[42] *Id.*
[43] *Id.* at 0:53.
[44] *Id.* at 1:16.

10

LEXIS 153188, at *10-11 (W.D. Ky. Aug. 30, 2023) (where driver was in his vehicle throughout the questioning, was not placed in handcuffs, only the questioning officer was present and the officer was courteous, asking about the presence of any firearms "in the very first minutes of the stop" did not constitute custodial questioning). Here, the question was asked in the very first seconds of the stop.

It was not inappropriate for Officer Shelton to inquire about weapons. The "mission" of a traffic stop is both to address the traffic violation "and attend to related safety concerns." *Rodriguez v. United* States, 575 U.S. 348, 354 (2015) (citation modified). The safety of an officer during a traffic stop is a "legitimate and weighty" interest. *Everett*, 601 F.3d at 494-95 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)). As such, an officer conducting a traffic stop may inquire about dangerous weapons. *Id.* Indeed, a question about weapons during a traffic stop "relates to concerns over officer safety and thus to the mission of the stop itself." *United States v. Arrington*, No. 20-6363, 2021 U.S. App. LEXIS 36780, at *6 (6th Cir. Dec. 13, 2021). Officer Shelton's follow-up questions as to the location of the handgun and whether it was loaded were likewise reasonably directed to his safety and asked amid Lussier's continued unsolicited explanations of his intention to meet individuals to arrange for narcotics purchases. All of this occurred within the first six minutes of the encounter, during which Lussier confirmed that he did not have a license.[45] It is noteworthy that, to the extent Officer Shelton was in any way delayed in moving on to the other aspects typical of completing the mission of a traffic stop, such as routine records checks and preparing a citation, it was largely due to Lussier's exceptionally talkative nature about his purported reason for being in the area.

---

[45] DN 18-3 at 5:02-6:21.

11

Attention turns next to Lussier's admission to Deputy Elder that he was a felon. As soon as Deputy Elder arrived at Lussier's driver side door (immediately on the heels of Officer Shelton's advisement of the presence of the firearm), Lussier, without prompting, confirmed its location. In a polite and nonconfrontational manner Deputy Elder asked Lussier to "lift out" the handgun.[46] As with Officer Shelton, Lussier again embarked on an unsolicited explanation that he had the handgun because it was necessary for his protection while engaged in purchasing narcotics on behalf of the drug task force.[47] Deputy Elder did not ask Lussier if he was a felon, he simply assured him that, as long as he was not a felon, he was entitled to have a firearm.[48] Lussier volunteered in response to Deputy Elder's statement that he was a felon.[49] Deputy Elder was not required to advise Lussier of his *Miranda* rights as he was not in custody; but even if he had been, his statement was not in response to a question. "[W]here a defendant makes a voluntary statement without being questioned or pressured by an interrogator, the statements are admissible despite the absence of *Miranda* warnings." *United States v. Murphy*, 107 F.3d 1199, 1204 (6th Cir. 1997).

As to the handgun itself, Lussier informed Officer Shelton of its location, who, in turn, informed Deputy Elder.[50] At the same time, Lussier confirmed to Deputy Elder the location of the handgun, telling him "it's right there."[51] As noted, Deputy Elder initially asked Lussier to hand him the gun; however, Lussier embarked on explaining why he had it.[52] After Lussier volunteered his felon status, Deputy Elder asked for permission to open the car door and Lussier gave unequivocal consent.[53] Given the totality of the circumstances, there is no doubt that the request

---

[46] DN 18-2 at 1:02.
[47] *Id.* at 1:07-1:11.
[48] *Id.* at 1:55.
[49] *Id.* at 1:56.
[50] DN 18-3 at 6:22.
[51] DN 18-2 at 0:15.
[52] *Id.* at 1:02-1:44.
[53] *Id.* at 1:56-2:20.

to open the door was so that Deputy Elder could access the handgun and Lussier would have understood it as such. This request was made pursuant to the interest of ensuring officer safety—a legitimate component of the traffic stop. Moreover, it occurred while Officer Shelton was conducting his records check and "an officer may ask unrelated questions to his heart's content, provided he does so during the supposedly dead time while he or another officer is completing a task related to the traffic violation." *Everett*, 601 F.3d at 492.

       Even had Lussier not consented to the search, a warrantless search was permissible in this instance. The Fourth Amendment protects individuals from unreasonable searches and seizures. Warrantless searches are per se unreasonable, unless subject to an exception to the warrant requirement. *Katz v. United States*, 389 U. S. 347, 357 (1967). One such exception is the "automobile exception," which permits a warrantless search of an automobile if there is "probable cause to believe that instrumentalities or evidence of crime may be found in the vehicle to be searched." *United States v. Graham*, 275 F.3d 490, 509 (6th Cir. 2001). "Under the automobile exception to the warrant requirement, an officer may perform a warrantless search of a detained vehicle should the officer have probable cause to believe the vehicle contains contraband or evidence of criminal activity." *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012). Here, Lussier's admissions that there was a firearm by his side and that he was a felon provided Deputy Elder abundant probable cause to believe that the vehicle contained evidence of a crime so as to justify a warrantless search.

## RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's motion to suppress evidence, DN 18, be **DENIED**.

H. Brent Brennenstuhl
United States Magistrate Judge

February 11, 2026

## NOTICE

Therefore, under the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C) and Fed. R. Civ. P. 72(b), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties. Within **fourteen (14) days** after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court. If a party has objections, such objections must be timely filed, or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd*, 474 U.S. 140 (1985).

H. Brent Brennenstuhl
United States Magistrate Judge

February 11, 2026

Copies: Counsel